IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

FRANKIE CHARLES JEFFREY                                       PLAINTIFF

       v.                           Civil No. 06-2156

MIKE CONGER, Jail Administrator;
and NURSE CRYSTAL REED                               DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

The events at issue in this lawsuit occurred while the plaintiff was incarcerated at the Sebastian County Detention Center. Specifically, plaintiff contends his constitutional rights were violated when he was denied adequate medical care.

Defendants filed a summary judgment motion (Doc. 31). To assist plaintiff in responding to the motion, a questionnaire was propounded (Doc. 34). Plaintiff filed a response to the questionnaire (Doc. 35). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

**Background**

Jeffrey was booked into the Sebastian County Detention Center (SCDC) on April 21, 2006, on charges of possession of methamphetamine with intent to deliver, possession of marijuana with intent to deliver, possession of drug paraphernalia, maintaining a premises for drug sales, criminal use of a prohibited weapon, and endangering the welfare of a minor. *Response* (Doc. 35)(hereinafter *Resp.*) at ¶ 1. He completed and signed a medical intake questionnaire that day. *Id.* at ¶ 2. He indicated he had a bad heart/circulatory problems, diabetes,

AO72A
(Rev. 8/82)

fainting spells, and a bone/back/joint injury. *Id.* He attributed his fainting spells and bone/back/joint problems to his diabetes. *Id.* He indicated he was taking medication and needed to have his prescription filled. *Id.*

Jeffrey was asked to indicate what medication he was taking, what medical condition it was for, and whether he was provided with his medication. *Resp.* at ¶ 4. He failed to respond. *Id.* His property taken by the jailer at the time of booking included no cash, one pair of shoes, one belt, one earring, one cell phone, ID, loose change, and paperwork. *Id.* at ¶ 5.

On April 27th, Jeffrey was admitted to Sparks Regional Medical Center (SRMC) after waking up with sharp chest pain. *Resp.* at ¶ 6. He reported he had been born with a bad valve and had always had heart trouble. *Id.* He received nitroglycerin at the jail but that did not help. *Id.* He was given nitroglycerin at the hospital. *Id.* He reported pain relief after receiving morphine at the hospital. *Id.* He received an echo stress test at the hospital. *Id.*

During intake at the SRMC on April 27th, Jeffrey was unable to recall all his medications but stated he was on 70/30 insulin, glyburide, glucophage, lisinopril, and aspirin. *Resp.* at ¶ 7. He was discharged on April 28th with a final diagnosis of non-cardiac chest wall pain, diabetes, cardiomyopathy, diabetes, hypertension, and alcoholism. *Id.* He was to take Tylenol for pain, thiamine daily for one week, glucophage daily, lisipropril daily, voltaren daily, insulin, aspirin, and prilosec. *Id.*

On May 1st Jeffrey was admitted to SRMC complaining of problems with a high sugar level and chest pain since Thursday. *Defts' Ex.* 4, Vol. 1 at page 33. The jail nurse reported he had refused his CBG (capillary blood glucose) check and was changing his insulin dose. *Id.* He reported he did not receive insulin on Saturday and began feeling sick later that night and was

brought to the emergency room in the early morning and found to be in DKA (diabetic ketoacidosis). *Id.*

The admission documents under past history indicate Jeffrey had about five hospital admissions with DKA with the last one in May of the previous year. *Defts' Ex.* 4, Vol. 1 at page 42. Jeffrey reported that his blood sugar readings fluctuate significantly with readings as low as 50 and as high as 300. *Id.* In fact, Jeffrey states his blood sugar goes as high as over 500 without insulin. *Resp.* at ¶ 11.

According to Jeffrey, he never refused any medication until after he came from the hospital and there were giving him too high of a dose of Lantus insulin. *Resp.* at ¶ 9. However, Jeffrey states he did not receive his insulin on April 30th. *Id.* at ¶ 10. When he pressed the button and they responded and he told them what his problem was, he states they just laughed. *Id.* After he became ill, Jeffrey states he heard Officer Farrel say: "I did not [know] I was to give him (Franke Jeffer) insulin." *Id.*

Jeffrey was discharged from SRMC on May 5th. *Resp.* at ¶ 12. He was discharged on the following medications Aspirin, Lisinopril, Colace, KCL (potassium), Indocin SR, Lantus insulin 18 units subcutaneously each morning and a sliding scale of NovoLog insulin with each meal depending on his CBG. *Id.* He received the prescribed medication. *Id.* at ¶ 13. However, Jeffrey believes the Lantus insulin was dropping his blood sugar too low and that the doctor really said 13 units not 18 units. *Id.* The written discharge summary from Sparks signed done by Dr. Kientz clearly calls for Jeffrey to be on 18 units. *Defts' Ex.* 4, Vol. 1 at page 67.

On May 27th items were dropped off at the jail for Jeffrey including glasses and insulin. *Resp.* at ¶ 14. The items were given to the supervisor by the receiving deputy, Deputy Dutton. *Id.*

AO72A
(Rev. 8/82)

On July 8th, Jeffrey submitted a grievance requesting to be moved from the hospital cell. *Defts' Ex.* 3 at page 1. He stated he was not manipulating his blood sugar. *Id.* He also made a request on behalf of Mr. Ortiz. *Id.* He indicated the only time he had been sick was when he did not receive his insulin. *Id.* He indicated that one occasion had been a simple mistake and had not been anyone's fault. *Id.* Jeffrey now contends the SCDC is at fault because he became sick when Officer Farrel did not provide him with his medication. *Resp.* at ¶ 15.

Sgt. Ritter initially responded to the grievance that he would consider giving Jeffrey a chance since he took an insulin pill. *Resp.* at ¶ 16. Sgt. Taulbee then responded on July 11, 2006, that he had talked to the nurse and both Jeffrey and Ortiz would be released with the understanding that if their blood sugar levels raise above the range they had been given they would be moved back to the hospital cell. *Id.*

On July 12th, medication for Jeffrey was dropped off by Vaughns Pharmacy. *Defts' Ex.* 2 at page 2. On July 15th, Jeffrey was treated at SRMC for an elevated blood sugar level. *Resp.* at ¶ 19. His CBG was at 369. *Id.* It was noted his blood sugar level fluctuates from the 100's to the 300's. *Id.* He also complained of dental pain. *Id.* He was discharged the following day with the instructions to follow up with the jail doctor in two or three days. *Defts' Ex.* 4, Vol II at page 4. He was instructed to take Bactrim as prescribed. *Id.*

On July 16th, Deputy Hamilton reported that Inmate Brock stated that he had seen Jeffrey pinch his skin on his stomach as if to administer the insulin and then he squirted the insulin on the wall. *Defts' Ex.* 5 at page 1. Jeffrey was later admitted to the hospital for his blood sugar being too high. *Id.* Brock reported that all this happened on July 15th. *Id. See Resp.* at ¶ 21 (Plaintiff responded he was without knowledge to agree or disagree).

AO72A
(Rev. 8/82)

Medication was dropped off at the SCDC on July 20th, including Insulin (70/30), four boxes of Beuacart HCT, and one box of insulin syringes. *Defts' Ex.* 2 at page 3. The medication was given to the nurse. *Id.*

Jeffrey submitted a grievance on August 22nd complaining he was falsely imprisoned by the City of Fort Smith and the State Prosecutor. *Resp.* at ¶ 23. Sgt. Ritter responded this was not a "grievable issue." *Id.*

On September 13th, Jeffrey submitted a grievance stating that his "r" card had been missing for a week and not all the deputies knew his case so it had been causing problems. *Resp.* at ¶ 24(A). He asked if they could please get his medication cards straight because it had caused problems with his health. *Id.* In response, he was told the nurse would see him that morning and check on the status of his medication and on his health. *Id.* He was told she would also make sure he was getting his medication as prescribed. *Id.*

According to Jeffrey, the "r" card told the deputies that he was on certain medication. *Resp.* at ¶ 24(B). He indicated he saw the new nurse that morning and she was very helpful to him and got the medication straight. *Id.* at ¶ 25.

On September 13th, at 1837 or 6:37 p.m., Deputy Scott reported that he had called Jeffrey up for his meds and blood sugar check. *Defts' Ex.* 5 at page 4. Scott indicated Jeffrey had taken his pills and then checked his blood sugar. *Id.* His blood sugar level was 426. *Id.* Scott then gave Jeffrey a syringe, Humulin 70/30 insulin, and the red biohazard box. *Id.* Jeffrey told Scott he also took Humulin R type insulin. *Id.* Scott recalled Jeffrey taking that type of insulin in the evening but there was none in the med box and he did not have a card for it. *Id.* Scott told Jeffrey he would bring it to the nurse's attention but that she had already gone for the day. *Id.*

According to Scott, Jeffrey stated he would take 10 units of the Humulin 70/30 to make

up for the Humulin R. *Defts' Ex.* 5 at page 4. Scott witnessed Jeffrey draw up 10 units in the syringe. *Id.* Scott advised Jeffrey that he needed to take only the 5 units that were prescribed to him. *Id.* Scott indicated Jeffrey replied that he would just take that until "you get all this figured out." *Id.* According to Scott, Jeffrey then turned towards the wall in the closet and Scott assumed he was giving himself the injection. *Id.* Scott signed the med card with Jeffrey's initials and his initials and placed the med card back in the box. *Id.* Scott then turned around and grabbed the red biohazard box. *Id.* at pages 4-5. The lid was closed. *Id.* Scott had handed it to Jeffrey with the lid open. *Id.* There was no needle on the shelf so Scott assumed Jeffrey had put it in the box while he had turned. *Id.* J

In response to each of the above statements, Jeffrey indicates he is without knowledge to agree or disagree. *Resp.* at ¶¶ 27-32. He then states Scott is a liar. *Id.*

Scott exited the pod after the inmates received their trays and went up front to get AA pods mail and give them time to eat. *Defts' Ex.* 5 at page 5. Scott returned at 5:35 pm to retrieve the dinner trays and pass out mail. *Resp.* at ¶ 33. Jeffrey approached him and said he was ready for his insulin. *Id.* Scott said he had not gotten Jeffrey a new bottle of Humulin R yet. *Id.* Scott replied he would just take his Humulin 70/30. *Id.* Scott replied Jeffrey had already received it. *Id.* Jeffrey said he had not taken it. *Id.*

According to Scott, he asked what Jeffrey had done with the needle he had given him earlier and he stated he had left it on the shelf in the closet. *Defts' Ex.* 5 at page 5. Jeffrey states he is without knowledge to agree to disagree. *Resp.* at ¶ 34. However, he states Scott took pride in being as mean and ugly to him as he could be. *Id.* Scott told Jeffrey he was not going to give him any more insulin that night and he could talk to his supervisor. *Resp.* at ¶ 35.

According to defendants' records, Jeffrey had refused his insulin that morning saying that he was fasting and he was given 10 units of 70/30 insulin at lunch. *Defts' Ex.* 5 at page 6. On September 14th, at 2315 or 11:15 p.m., Deputy Medlock called to report that Jeffrey's blood sugar reading was 475. *Defts' Ex.* 5 at page 2. Medlock was advised to recheck Jeffrey's CBG and he could not obtain a reading. *Id.* Jeffrey advised Medlock he had been drinking hot chocolate. *Id.*

Medlock was advised to escort Jeffrey to intake where he was placed on a bench for observation. *Defts' Ex.* 5 at page 2. Nurse Bass was contacted and advised of the situation. *Id.* She instructed them to give Jeffrey 15 units of 70/30 insulin. *Id.* He was to be rechecked in 15 minutes. *Id.*

After fifteen minutes, Jeffrey's CBG was 561. *Defts' Ex.* 5 at page 3. Fifteen minutes later, his CBG was 538. *Id.* At 0100 his CBG was 475. *Id.* At 0235 his CBG was 363. *Id.* Jeffrey had no complaints and appeared not to be in distress. *Id.* He was placed in hospital cell HC-1. *Id.* At 0600 his CBG was 256. *Id.*

On September 16th, Jeffrey submitted a grievance complaining he had been returned to the hospital cell due to mistakes made in the administration of his medication. *Resp.* at ¶ 40. He complained that he needed the rest of his medication. *Id.* In response, he was told to fill out a medical slip to discuss it with the nurse. *Id.* at ¶ 41.

On September 24th, he submitted a grievance stating that he had been told to sign his own medication cards. *Resp.* at ¶ 42. He complained Deputy Medlock would not give him the opportunity to sign the cards. *Id.* The shift sergeant responded that this would be looked into. *Id.*

AO72A
(Rev. 8/82)

On September 29th, Jeffrey submitted a grievance complaining that Deputy Riley refused to give him medication. *Resp.* at ¶ 43. When he pushed the help button, he stated Riley returned and called him names and threatened him. *Id.* Sgt. Taulbee responded that this was being looked into. *Id.*

On October 16th, Jeffrey submitted grievances complaining that Riley continued to cause him problems. *Resp.* at ¶ 44. He indicated Riley had failed to give him insulin and was giving him a hard time. *Id.* In response, Sgt. Taulbee stated he would look into Jeffrey's complaints against Riley. *Id.* Additionally, due to Jeffrey's poor health he was moved to HC-1 for observation on a closer basis. *Id.*

On October 23rd, Jeffrey obtained a bail bond of $50,000 and was released from the SCDC. *Resp.* at ¶ 45. Jeffrey was asked to explain in detail how Nurse Reed exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 59. Jeffrey responded:

> that lady stayed locked in that office all day. And she told my doctor said to put me in that cell. But when I later ask Doctor Houri he advised me he never gave such instruction. I was in that cell 84 days. And the light never went off. That is creul and unusual in its self.

*Id.*

Jeffrey was asked to explain in detail how Mike Conger exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 60. Jeffrey responded:

> I have to say he should have look closer at what goes on hin his jail. After all I should have never been in jail. They dropped all charges except a posseson. I would not pleaded guilty if the guy that was prosicuting us was now my Judge. I think this is illegal too.

*Id.*

Jeffrey denies that all decisions regarding his medical treatment were made by medical personnel. *Resp.* at ¶ 61. He states that "Office Rob" would take food off his tray and tell him

-8-

he did not need it. *Id.* Jeffrey indicates "Office Rob" would say Jeffrey was diabetic and he knew what Jeffrey needed. *Id.* As a result, Jeffrey stated he was often hungry. *Id.*

On October 30th, Jeffrey was at the SCDC to pick up a booking sheet and spoke with Deputy Creekmore and Deputy Helmert who asked how he was doing now he was out of jail. *Id.* at ¶ 46(A). According to Creekmore and Helmert, Jeffrey stated he was doing ok but missed how well he had been treated at the SCDC. *Defts' Ex.* 5 at page 7. He stated he missed how they had made sure he had his medications, something to eat, and a bed to sleep in. *Id.* They maintain Jeffrey apologized for causing problems and stated he hoped to see them again. *Id.*

Jeffrey disputes he said any of this. *Resp.* at ¶ 46(B). In fact, he states if they took care of him why would he have filed this lawsuit or had to have gone to the hospital. *Id.*

Jeffrey was treated at SRMC for abdominal pain and nausea on October 30th. *Defts' Ex.* 4, Vol. II at pages 11-20. He reported being out of insulin since the day before. *Id.* He was to follow up with a diabetic teaching class on November 8th and were also instructed to establish himself with a primary care physician prior to an appointment on December 14th with Dr. Houri. *Id.*

He was treated again at SRMC on January 3, 2007, for low back pain and uncontrolled insulin-dependent diabetes mellitus (IDDM) . *Defts' Ex.* 4, Vol. II at pages 22-34. He also reported being out of insulin. *Id.*

On January 6th, Jeffrey was admitted to SRMC for abdominal cramping and vomiting. *Defts' Ex.* 4, Vol. II at pages 36-48. His admission diagnoses were: acute pancreatitis; intractable nausea/vomiting; hyperglycemia; history of chronic DKA; and history of dilated cardiomyopathy. *Id.* He was discharged on January 9th. *Id.* His discharge diagnoses were:

chest pain; uncontrolled diabetes mellitus; hypertension; and intractable nausea/vomiting. *Id.* He was to get diabetic education and follow up as an outpatient at AHEC with Dr. Chans Nouansavane in two weeks. *Id.* at page 48. Dr. Hernandez, who was asked to consult regarding Jeffrey's complaints of chest pain, stated that he "had never been complaint" with his "medical management" and it would be "extremely difficult to provide any kind of reasonable help, as [Jeffrey] did not take his medical management." *Id.* at page 74.

On March 19th, Jeffrey was admitted to SRMC for nausea and vomiting. *Defts' Ex.* 4, Vol. III at pages 9-10. He reported not being complaint with his medications and not having taken his insulin for several days until the day before when he had given himself three shots of insulin throughout the day up to 100 units total. *Id.* He also reported having chest wall pain. *Id.* He remained hospitalized until March 26th. His discharge diagnoses were: chest pain ruled out by myocardial infarction; nausea and vomiting resolved; hypoglycemia, resolved; nonischemic cardiomyopathy; history of ventricular tachycardia; and diabetes mellitus. *Id.* at page 20.

Jeffrey told Dr. Hodge he was in the process of suing the SCDC because they jailed him for no reason. *Resp.* at ¶ 54; *Defts' Ex.* 4, Vol. III at pages 47-48. Jeffrey also said the SCDC did not treat his diabetes well. *Id.* Jeffrey accused Dr. Hodge of telling the SCDC to hold him in a special cell. *Id.* Dr. Hodge explained to Jeffrey that he had no contact at all with the SCDC or anybody who had taken care of Jeffrey since his discharge in May of 2006. *Id.* In fact, when Jeffrey was hospitalized then Dr. Hodge recalled telling the deputy that Jeffrey needed to get his insulin on time otherwise he would end up in the hospital with diabetic ketoacidosis. *Id.*

AO72A
(Rev. 8/82)

When Jeffrey was discharged on March 26th he was concerned about pain control. *Defts' Ex.* 4, Vol. III at page 52. He was informed that he would not be sent home on narcotics. *Id.* According to the hospital records, he was upset and stated that it was "very poor care." *Id.* Jeffrey disagrees with this record. *Resp.* at ¶ 55. However, he does not explain his disagreement. *Id.*

On May 17th, Jeffrey was again admitted to SRMC. *Resp.* at ¶ 56; *Defts' Ex.* 4, Vol. IV at page 22. He was complaining he had run out of insulin. *Id.* His admitting diagnoses were: diabetic ketoacidosis; diabetes mellitus; cardiomyopathy; and chronic back pain. *Id.* He remained hospitalized until May 21st. *Resp.* at ¶ 57; *Defts' Ex.* 4, Vol. IV at page 22. His discharge diagnoses were: diabetic ketoacidosis, resolved; diabetes mellitus type 1; chronic back pain; congestive heart failure; cardiomyopathy; peptic ulcer disease; and anemia. *Id.*

On May 30th, Jeffrey had a MRI of his lumbar spine at SRMC. *Defts' Ex.* 4, Vol. VII at page 59. It showed mild degenerative signal changes in the L4 and L5 disc with no focal herniation or significant spondylosis. *Id.*

## **Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth

specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment. Defendants first argue they have been sued in their official capacities only and there is no proof of an unconstitutional Sebastian County policy. They therefore contend they are entitled to judgment as a matter of law on all claims asserted by the plaintiff.

Alternatively, if the complaint is construed as asserting individual capacity claims, defendants nevertheless contend they are entitled to summary judgment in their favor because there is no proof of deliberate indifference to Jeffrey's serious medical needs. We will address each argument in turn.

### *Official versus Individual Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the

Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). *See also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the

-13-

Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

At the same time, we are charged with liberally construing pro se complaints. *See e.g. Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)(requirement that pro se complaints be construed even more liberally than counseled pleadings); *White v. Wyrick*, 530 F.2d 818, 819 (8th Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief"). *See also, Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997)(complaint against state officials who were sued in their official capacities was deemed amended to assert personal capacity claims, where plaintiff moved to amend complaint in response to motion for summary judgment). In responding to the summary judgment motion, Jeffrey indicates he intended to sue Reed and Conger in both their individual and official capacities. *Resp.* at ¶ 67. We will therefore construe the complaint to be asserting both individual and official capacities claims against the defendants.

### *Denial of Medical Care*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719,

-14-

140 L. Ed. 2d 1043 (1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by

AO72A
(Rev. 8/82)

medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

Jeffrey mentions the following actions which he contends constitute deliberate indifference to his serious medical needs: on April 30th Officer Farrel failed to provide him with insulin resulting in his hospitalization on May 1st; following his discharge from the hospital on May 5th he was given 18 units of Lantus insulin each morning which was too high a dose; he was in the hospital cell at the SCDC for eighty-four days allegedly upon the orders of Dr. Houri and Dr. Houri gave no such orders; on September 13th Deputy Scott refused to allow him to take ten units of Humulin 70/30 insulin instead of the five units he was prescribed to make up for the Humulin R insulin for which the medication card was missing and then later refused to provide him with the Humulin 70/30 insulin; and "Office Bob" took food items from his tray.

We believe there are no genuine issues of material fact as to whether the named defendants exhibited deliberate indifference to Jeffrey's serious medical needs. First, with respect to Mike Conger, there is no evidence he was personally involved making any decisions regarding Jeffrey's medical care. Nor is there any evidence that he knew of Jeffrey's problems in receiving his insulin or allegedly getting too much insulin, or Officer Bob allegedly taking food from Jeffrey's tray, or was involved in the decision to assign Jeffrey to the hospital cell. Instead, the decisions regarding Jeffrey's medical care were made by the medical staff and treatment decisions were made by medical personnel. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)(*respondeat superior* liability not permissible under § 1983); *Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires

AO72A
(Rev. 8/82)

some personal involvement or responsibility). There is simply no basis on which Mike Conger can be held liable. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535-36 (8th Cir. 1999).

Second, with respect to Nurse Reed, most of the alleged instances of deliberate indifference cited by Jeffrey simply are not evidence of deliberate indifference on her part. This is true with his claim that she or others at the SCDC gave him too high a dose of insulin following his release from the hospital on May 5th. The hospital discharge papers clearly indicate Jeffrey was prescribed 18 units Lantus insulin subcutaneously each morning. *Defts' Ex.* 4, Vol. 1 at page 67. This is the dosage he was provided. The decision regarding the dosage he was to receive is clearly not attributable to Nurse Reed or personnel at the SCDC.

With respect to the incident involving Deputy Scott, there is no indication Nurse Reed was personally involved in this incident or even aware of it. The summary judgment record indicates the detention center nurse, whether it was Nurse Reed or some other nurse, was not on duty when the incident between Jeffrey and Deputy Scott occurred. *Defts' Ex.* 5 at pages 4-5. This problem with Scott is alleged to have occurred on only the one occasion, September 13th. *Id.*

Similarly, there is no indication Nurse Reed was personally involved in, or even aware of the fact, that "Office Rob" was taking food off Jeffrey's tray. *Resp.* at ¶ 61. With respect to Officer Farrel not giving Jeffrey his insulin on April 30th, there is no indication Nurse Reed was present in the facility on that date, aware of the fact that Farrel did not dispense the medication to Jeffrey that day, or that she was consulted prior to Jeffrey becoming ill. *Resp.* at ¶ 9-¶10. Jeffrey only alleges Farrel made this mistake on one occasion. *Id.* Once Jeffrey became ill, he was taken to the hospital for treatment. *Defts. Ex.* 4, Vol. 1 at page 33.

-17-

With respect to Jeffrey being assigned to the hospital cell, while he apparently did not like this assignment, the assignment does not in anyway exhibit deliberate indifference to his serious medical needs. "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted). In fact, assignment to the hospital cell exhibits concern for Jeffrey's health.

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 31) be granted.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 31st day of July 2008.

                                                  s/ *J. Marschewski*
                                                  HON. JAMES R. MARSCHEWSKI
                                                  UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)